3-0-9-0-5-9-5. People of the State of Illinois at the lead by Laura DeMichael v. Harold Charles Groel. Alibi, Jay Wigman. Mr. Wigman. Good afternoon. May it please the Court, Counsel. I am Jay Wigman, an attorney for defendant and felon Harold Groel, who, following an appeal from his conviction of one count of criminal sexual assault, has raised four issues. I do not anticipate covering all four issues, in part because of time, and so my focus is going to be primarily on the first issue, which is that defendant was not proved guilty beyond reasonable doubt, primarily because, as the son-in-law of the foster mom of the three complainants, he did not occupy a position of trust, authority, or supervision. I think it's also appropriate to focus on reasonable doubt because the remaining three issues, while there is seemingly clear error in each of those for different reasons, then turns to a question of prejudice. For instance, the fourth issue regards prosecutorial misconduct in closing arguments when the prosecutor stated, without there having been any evidentiary basis, that millions of people went through life without disclosing sexual assault. The problem there is that that was an unpreserved error,  And so in part because each of the three remaining issues can be enveloped within the reasonable doubt analysis, I'll be focusing primarily on reasonable doubt. Of course, if the court has any questions, I'm more than happy to address those as we go. Before getting to the reasonable doubt analysis, and I apologize, I'm aware that the court has read the briefs, but particularly in pretrial, there's, I think, a need to focus on the errors that occurred because of the rather unusual occurrences during trial and the errors that occurred as a result. The basic background is that there were three complainants and six total charges. The defendant was the son-in-law of a foster mother who had several foster children. She testified 25 throughout the year. In this particular case, there were two charges related to TA, and that is the one conviction that arose out of this case. There were three charges related to SN and one charge related to AP. And, of course, I'm using the initials because of privacy concerns in a juvenile matter. There was also another juvenile, DC, who insisted throughout the trial that there had been no inappropriate relationship with the defendant, and she was called as a defense witness. But the state wanted to use recordings of conversations between her and the defendant that occurred while the defendant was incarcerated as propensity evidence in this case. The trial court allowed this without engaging in any sort of prejudice determination or balancing as to whether the prejudicial nature of the propensity evidence outweighed its probative nature, which was in question in large part because while, again, there was perhaps some evidence of inappropriate inclinations, there was no showing that there had been an offense committed or any proof toward propensity. Then at trial, the next thing that occurred was that the witness to whom three charges related did not appear as she was required to under subpoena. This went over several days of trial. When she didn't appear during the state's case, the state moved to dismiss. Then the next day or later that day, I believe, SN appeared, and there was a move made by the state for her to appear as a propensity witness. This was allowed, and during that case, not only was there no prejudice evaluation, but in fact the court specifically declined to engage in that analysis. The defense counsel requested leave to cross-examine and go into some of the prejudicial nature, and that was not allowed by the trial court who said that he had enough to go on and granted the motion. At trial, TA, the first witness, and again the only one against whom there was a conviction or related to whom there was a conviction, testified as to two incidents. She said one basically was very suddenly defendant engaged in sexual behavior with her, and that's when the offense occurred. As to the other offense, and she at different times reversed the order of the two events, she said that it had happened when he had driven her to his workplace, although she couldn't identify where he worked, and she identified certain features of the office such as carpet in a medical facility when the employer testified that there was none, and the defendant was acquitted of this charge. AP testified, again similar to the first charge with TA, that there was suddenly sex had while the two were watching movies after they had been drinking wine pours throughout the evening. The defendant testified, first presenting numerous witnesses as to the reputation for dishonesty of AP. There was no such testimony or evidence regarding TA. The defendant also fronted several convictions that had resulted from a finding by the trial court that there were certain under Montgomery convictions that were allowed, there were certain convictions that the state wasn't going to be allowed to use for impeachment. The defendant stated a series of convictions when asked by trial counsel, what is your criminal history, and listed several. In fact, he added one that the trial court had ruled was not admissible for impeachment under Montgomery. He did not mention an offense that was a misdemeanor, and it wasn't a misdemeanor related to lying or a truthfulness crime, but was instead one that had been a second count in a felony case, and the trial court, instead of listing the two convictions in that case, simply said that he would allow this felony case to be used as impeachment. There was no discussion, although the state has indicated that at the time, the state's attorney knew and had certified copies of convictions showing that it was a misdemeanor, and those were appended to the briefs in this case. Was that on a guilty plea? I believe it was following a trial. It may have been a guilty plea. This conviction was used by the state during its closing, when the state commented on how one factor demonstrating that the defendant was not a good father was the fact that there had been this endangerment charge, and this was a charge that wasn't related to any of the counts while there had initially been a charge of endangerment that was dismissed when SN didn't appear. So it was unrelated to the cause and overly prejudicial, particularly as used by the state in closing. The state also commented in closing, again, that millions of people are in society, don't report sexual assault. There had been no expert testimony on that basis, although the trial court had said that this wasn't the subject that's within common knowledge or understanding of citizens, and that, in fact, it might be an appropriate basis for expert testimony when there was this discussion and the state indicated it wanted to call an expert. While the court indicated that that would be considered by the court, the state never revisited the subject, and that testimony was not presented to the jury. Turning then to the first substantive argument, and again, as I say, the primary argument, is that the defendant in this case was not proved guilty beyond a reasonable doubt, primarily because, and there are other reasons as well, but as an element of the offense, it was not established that he was in a position of trust or authority or supervision. He certainly was not a person who was placed in a position of authority with the complainants or one who was trusted. In fact, the exact opposite is the case. The defendant was, as I stated, the son-in-law of the foster parent. Now, his wife was approved by DCFS and, I believe, Catholic Charities and the supervising agencies as a babysitter and provided relief babysitting for the foster mother. And, in fact, the wife employed her on occasion to babysit her own children. But the defendant specifically was never approved by the agencies, and the foster mother, the mother-in-law, indicated that she did not apply for him to be approved because she knew that with his criminal background he wouldn't pass an investigation. She also stated that the girls in her care were such that they could not be trusted with a man alone. And so, very specifically, he was never alone with the girls. The foster mother left her with the wife under the condition, again, that the defendant was not to be left alone with the children. There's no indication whatsoever that he served in any sort of supervisory capacity or as an authority figure or as a trusted figure. And, notably, during two of the four-year period that's at issue, and possibly three years depending on how the dates evolve, during the majority of the period the defendant was incarcerated. And, certainly, there is no person who's going to be coming from prison and home, and in one instance home for a month, who's going to, one, be able to develop a relationship, or, two, be held out as somebody who is an authority figure for these girls. Given that he categorically does not apply as somebody who was a trusted figure or an authority figure or, to any sort of testimony, a supervisory figure, the state failed to prove the defendant guilty beyond a reasonable doubt where this is an element of the offense. Let me just ask you on the issue of whether he qualifies as an authority figure. Is this a question of fact, question of law? The only legal determinations have been made are that there are categories that seemingly per se qualify, but there hasn't been, to my knowledge, any sort of determination in a situation such as this whether the spouse of a baby, certainly a babysitter is somebody who would qualify, and a teacher, and a coach. And that's, according to SECOR issued by this court, that's the type of person that is considered under the rubric of this law. Whether the spouse qualifies as well has never been considered. Now, and I believe SECOR was somewhat close to the extent that it was a husband and wife, but in that case, in particular, the court found that the father, the defendant in SECOR, had made a call to the other family and said, hey, why don't you send your boy over for an overnight visit, and had taken the boys to, I think, to get a can of pop or rent movies and come back. So to the extent that there's been a category established, there is not a legal finding. It probably is a question of fact as to whether the defendant in this instance provided any sort of supervision or authority. Or the position of authority, the statutory term position of authority. It is. But there's no definition of that. And so, yes, it's generally left to the finder of fact. But it doesn't fit in with any of the other analyses of the cases that have come before this court or the other appellate courts in Illinois in terms of a defendant who is the son-in-law of the foster parent who is specifically excluded from babysitting duties or authority in that fashion. And there's no testimony that the girls held him in any sort of regard as an authority figure or as a trusted figure or a supervisory figure. The state has pointed out that one of the girls, not the one to whom the conviction applies, testified that they were told that they had to be respectful to these people who were obviously older than they are. The defendant was approximately 50 years of age. But there is nothing to indicate that that's anything beyond the societal norm. Children are often told, respect your elders, be polite. Well, yes, I mean, where I guess I'm going with the question is, what do you think our standard of review is on this issue of whether he's a... I think that this court can consider it as a legal matter to the extent that this is an element of the offense. And the question is whether, viewed in the light most favorable to the state, he qualified as a trusted figure. He's not per se excluded. But the facts of this case suggest that he did not qualify as an authority figure or provide any supervision. That's not in question. And so based on the facts, again, in the light viewed most favorably to the state, the defendant simply did not qualify as an authority figure or a figure of trust. There was no indication, as there are in most cases, that he worked closely with the kids either as a mentor in Reynolds or actually as an employer in Reynolds. Or in any sort of fashion that he was a coach or a teacher or someone upon whom these people relied. And that is one of the questions that makes this more of a legal determination is that there's always a question of whether he's an authority figure in relation to these kids. And the answer or the proofs simply do not show that he was an authority figure or a trusted figure by these kids. Again, another comparison to SECOR is that you were dealing with families that had a mutual relationship over a 10-year period and a mutual trust. Can your kid come over for the night? Sure, that's fine. But here, the foster mother placed the children with the defendant's wife specifically under the understanding that the defendant was not to be allowed alone with these children. So in this sense, there was no relationship that can be established or any way to indicate that there was a trusted or supervisory relationship. Given that, I would also note that there were other things, and these are, again, factual findings. But there was at least a, well, at most a seven-year delay, at least a two-year delay in the reporting. And this relates, again, to the fourth factor of the prosecutorial misconduct with the state saying the defendant or millions of people go and don't report offenses that happen to them. But there had been no testimony about this, and it's a natural assumption that if somebody is sexually assaulted, the outcry is going to be fairly immediate. I think so. Cases say that. The natural assumption is unless there is something about the familial relationship or the circumstances that would prevent an immediate outcry, if there is a fear particularly of a father or another family figure, under those circumstances, then the delay can be understood. But it has to be explained because the natural assumption is that people will reveal something that has happened to them of this nature. And in this case, we have a girl who left the home and had been gone for a year and a half before there was any indication from her, and that only came when DCFS went and interviewed her based on a report from somebody else. With that kind of delay, there's a natural question, and it's certainly fair for defense counsel to argue it, but that argument was stripped of him when the state stood up and said, well, we all know millions of people are walking around and they're not reporting, and that doesn't mean that the delay means anything in this case. Thank you. Thank you, Mr. Wigman. Ms. DeMichael? May it please the Court? Counsel, Laura DeMichael on behalf of the people. The people will focus on Issue 1, as that's the issue the defendant is focused on, but as he's touched on the other issues, I'll touch on those a little bit as well. Regarding the reasonable doubt issue, we're just looking at the one count that defendant was proven guilty beyond a reasonable doubt on. The jury found him guilty of the criminal sexual assault on one count regarding TA. The question we're looking at is whether, viewing the evidence in the light most favorable to the people, any rational trier of fact could have found the essential elements of that crime proven beyond a reasonable doubt, and here the answer is yes. Specifically, the people did prove that defendant was in a relationship of trust, authority, or supervision in relationship to TA. TA testified that she first met defendant when she was 13. Defendant was not in prison until she was 14. And the sexual assault occurred a year later, so there would have been this year in which he could have been building up the trust relationship with her. She first met him when she was placed in the foster home of Judy Morris. Defendant was the son-in-law of her foster mother, and she said they would hang out as a family, so she viewed him as part of the family. TA testified that she had a good relationship with defendant. In fact, TA testified that defendant was the only adult in her life that she had a good relationship with at the time. Under those circumstances, the evidence did show that TA trusted defendant. Regarding the testimony of defendant's wife and defendant's mother-in-law that TA was never left alone with him, well, she wasn't supposed to be left alone with him, but viewing the evidence in the light most favorable to the people, TA's testimony clearly shows that he did have that access, and the jury was to determine the credibility of the witnesses. The jury clearly found that defendant had the access, and their determination is to be upheld as it was a determination that a rational jury could make. Regarding the delay in reporting, that does not create a reasonable doubt. That is just one piece of information that the jury could consider as part of the total evidence, and the delay happened because TA came forward in response to the investigation. She hadn't wanted to talk about the incident, which makes sense because she was 14 at the time of the incident. She'd already been in 10 different foster homes before coming to Morris'. Morris' had guardianship of her, so she thought that if she reported the incident, she still wouldn't be moved from Morris' house. TA testified that she was scared of defendant, and TA also testified that the people she told about the sexual assaults didn't believe her. The verdict is supported by the evidence and should be affirmed. Next, touching on the closing argument issue, which defendant contends is prosecutorial misconduct. First of all, people note that, as the defendant mentioned, the defense counsel did not object to the remark, and the remark was not that millions of people don't disclose. The remark was thousands, maybe even millions of people haven't disclosed. The people contend that the maybe even millions part was simple hyperbole, the jury could recognize that, and that the people were not arguing a psychological basis for failing to report, but merely stating that not all people report their sexual assault when it happens to them. And furthermore, the jury was given proper instructions of law, which cured any error under DeSantiago. The trial judge instructed the jury that closing arguments are not evidence, and that jurors should disregard any argument not based on the evidence. 1226 of the record, 1286 of the record, and C244. Defendant also touched on the impeachment and prior conviction issue, saying that defendant was just fronting his convictions, but it's clear that defendant wasn't just fronting his convictions. Defense counsel asked the very broad question, tell us what your criminal history is, and in response defendant admitted seven convictions, and those convictions that he admitted were not the ones that the trial judge, three of the seven convictions he admitted were not ones that the trial judge had ruled were admissible. So they would only come in if he's meaning to imply that he's disclosing his entire criminal history. He discloses the tampering with evidence conviction that the trial judge had previously ruled inadmissible, and an unauthorized use of a credit card in dealing stolen property conviction that the people hadn't even sought to admit. So it's clear that he's not limiting himself to just fronting the Montgomery convictions. And regarding the other conduct evidence, the other conduct evidence was properly admitted, as the offenses were highly similar in close proximity and time, so the very high probative value was not substantially outweighed by the risk of unfair prejudice. The trial judge properly held the 115-7.3C hearings, at which it was shown that the offenses were highly similar in close proximity and time. All of the victims were the teenage foster daughters, or all of the girls against whom sexual conduct was indicated with defendant were the teenage foster daughters of Judy Morris. They were all similar ages in the 14 to 16 range, and the close proximity and time where the T.A. conduct stopped when the S.N. and D.C. conduct began. If there are no further questions, the people would ask that this court affirm the defendant's conviction. No questions? Thank you, Your Honor. All right, thank you, Mr. Michael. Mr. Wigman, any rebuttal? Thank you, Your Honor. Proceeding in order following the State's comments, I would note that the State indicated that we're simply looking at one count here, but I would note that looking at the other counts, the other two remaining on which the jury acquitted the defendant of the charge, much of the testimony demonstrates the reliability or the lack of reliability of the testimony that was given. For instance, one of the difficulties or one of the comparisons between those three sets of charges is that the two for which the defendant was convicted were instances where the defendant could show that it wasn't possible that the offense occurred as was testified to. As to the third, it was one when he couldn't account for the time, there weren't enough details that were given that he could in any way defend himself against the charge, particularly when you're scheduled over a four-year time period. And this is one of the problems that was noted in Cardamom, where the second district considered other crimes' evidence and found that one of the factors that the court must consider when admitting this kind of evidence is whether the defendant is able to defend himself against a charge or whether the time period is so vague that he's not able to. And for that reason, in part, the Cardamom court reversed the trial court. In this case, there was no consideration given by the trial court as to the impact of the testimony or the defendant's ability to defend himself. In fact, when following SN's testimony, the defense counsel requested permission to ask questions so as to discuss the prejudice problem. The trial court flatly denied it. Without engaging in this kind of prejudice versus protive determination, without an opportunity for a defendant to be able to defend against charges in a vague time period over this period, when there was nothing specific about that allegation that would allow him to defend against it, the defendant was prejudiced and the court in error in its admission of other crimes' evidence. And the other crimes' evidence wasn't particularly similar. We're dealing, again, another difference between the two offenses of which he was acquitted and the one offense of which he was convicted, is that that offense, along with the conviction, is possibly similar to DC's testimony of a relationship or testimony provided by SN that they got drunk one evening while watching movies and had sex. With the other two allegations where the jury found that the defendant was not guilty, the only showing was that there was force or a threat of force and that there was no buildup to the offense, that it wasn't any sort of relationship that was inappropriate, but instead was a force and was charged in that fashion as well. This charge was based on the position of trust, and the position of trust simply wasn't shown in the incident case. Turning to the state's argument about the closing simply being hyperbole, that has been allowed in cases where there is an evidentiary basis, where, for instance, DNA shows that it's a 46 trillion to one chance of it being somebody else, and the prosecutor steps up and says, it's a lock, it's a guarantee. Well, no, it's hyperbole in that there's a one in 46 trillion chance, but there's been testimony to that effect. Here, there was no such testimony, and this was an area that the court specifically enunciated was not something that was simply within the ordinary canon of a citizen, and therefore something that should have had an evidentiary basis and did not. And again, the prejudice is that it stripped the defendant of the opportunity to strongly argue that the delay mitigated against the charges that were brought against him. And was there an objection? There was no objection in the closing argument. May I ask you a question on the propensity evidence? Yes. If it was so unduly prejudicial that it requires a new trial, how do you address the fact that the jury looked through that and still found him not guilty on two other penalties? If it was so prejudicial, then they just returned a guilty verdict on everything because he's a bad guy. The counter to that is that where there's smoke, there's fire, and that it was so seemingly inappropriate and the evidence so smeared the defendant that the fear in case law is that the jury is going to convict because he's a bad guy, and because he's painted as a bad guy. Not because the evidence suggested that he was likely to commit that kind of offense, but because he's a bad guy and he needs to be punished. They acquitted him. They acquitted on two, and obviously I can't argue that there's inconsistency in the verdicts, but the fear is that the jury saw him as a bad guy who needed to be punished, and he didn't have a defense for that offense. With the other two, he could say, for instance, the charge related to AP, where she said that in an approximately 20-minute period, the defendant's wife had gone shopping for movies to rent and then came back that defendant had suddenly, simply had sex with her and that had been the end of it. On the one occasion when she said that they were alone, there was testimony from neighbors that he was across the street at their house and testimony from others that he was not alone with her. Similarly, with the one charge related to TA, of which he was acquitted, she testified that they had driven to his office. She didn't know where the office was. She said that there was carpet in the building. There was not, with the exception of one room that his employer said he didn't have access to. She testified that she had carpet burns and that couldn't have occurred. There were factors that the defendant could defend himself on, but he didn't have that available to him with the one charge. And so the concern is that with the evidence or with the claims that are made and with defendant appearing to be as bad as the evidence made him to look, this evidence that didn't relate to the offense in the same way that it might have to the other allegations where there was some sort of grooming or relationship involved, then in that instance that's the concern, that there isn't an ability to defend against it and that the jury, without the evidence to actually rebut the charge, opted to find him guilty. It was very clear that the state's case must be built on the strength of its case and the defendant should not be convicted based on the weakness of his own case. And it's our contention that it was the weakness as to that count coupled with the admission of this other crime's evidence that was never viewed with a mind toward the prejudiced nature as the court is required to consider it that requires that the conviction be overturned. If we agree with you and overturn the conviction and it goes back to the trial court, then I would assume the charges involving S.N. as the victim could be reinstated. I'm not so sure if that's the case. And the state had conceded that there was a double jeopardy issue had it tried to reinstate the charges. All right. Thank you. Good job, sir. Thank you, Mr. Wigman. Thank you both for your arguments here this afternoon. This matter will be taken under advisement.